Robert T. Kugler (MN #0194116)

Edwin H. Caldie (MN #0388930)

STINSON LEONARD STREET LLP

50 S 6th Street, Suite 2600

Minneapolis, MN 55402

Tel: (612) 335- 1500

Robert.Kugler@stinson.com

Ed.Caldie@stinson.com

*Counsel for the Official Committee of Unsecured Creditors*

IN THE DISTRICT COURT OF GUAM

TERRITORY OF GUAM

BANKRUPTCY DIVISION

| | |
|---|---|
| In re: | Chapter 11 Bankruptcy |
| ARCHBISHOP OF AGAÑA, | Case No. 19-00010 |
| a Corporation Sole, | **APPLICATION TO EMPLOY KEEN-SUMMIT CAPITAL PARTNERS LLC AS SUPPLEMENTAL REAL ESTATE AGENT FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS** |
| Debtor. | |

TO: UNITED STATES BANKRUPTCY JUDGE AND THE UNITED STATES TRUSTEE

  1.  The Archdiocese's Chapter 11 filing can be distilled accurately into one, simple purpose: to acknowledge and redress (to the extent possible) profound wrongs perpetrated against more than 200 unsecured creditors. Nearly all of these creditors are individuals that have been sexually abused and ignored, and many were actively silenced by their families, their friends, and

the church for decades. If the Archdiocese is to achieve the "fresh start" it seeks in an authentic way, these survivors of abuse must be acknowledged in an authentic way. Survivors must believe that their voices now matter.

2. Many of the above points were made by The Official Committee of Unsecured Creditors (the "Committee") at the last hearing relating to the sale of the Accion Hotel, on May 31, 2019. At the conclusion of that hearing, the Archdiocese agreed to cooperate with the Committee to undertake renewed efforts to market the Accion Hotel property throughout Asia and, to that end, the parties agreed to extend the timeline for marketing the Accion Hotel through August 9, 2019. The Court granted the parties' joint request to do so.

3. Unfortunately events since the May 31 hearing have not unfolded as the Committee hoped and expected they would. A non-comprehensive summary of relevant events is provided in the declaration of Robert T. Kugler ("Kugler Decl."), attached as **Exhibit A**, for the Court's reference.

4. After careful consideration and direct communications with the Debtor's existing real estate agents Gina Campos and Elizabeth C. Duenas of RE/MAX Diamond Realty (collectively "RE/MAX"), members of the Committee unanimously agreed that the Accion Hotel property had not been sufficiently marketed in Japan, Korea, China, and elsewhere in Asia. Kugler Decl. ¶ 8. At the Committee's direction, Committee counsel urged the Debtor to hire a second real estate marketing firm, Keen-Summit Capital Partners LLC ("Keen"), to supplement Ms. Campos's marketing efforts in Asia. After materially delaying action on the issue, the Debtor refused the Committee's request and articulated two reasons for doing so: (i) the Debtor believed that the $50,000 guaranty required by Keen, which is detailed further below, was too great an expense for the estate to bear, and (ii) Debtor's counsel expressed concerned that Keen Summit, even if retained, would not have sufficient time to do its work before the hearing on August 9, 2019.[1] Kugler Decl. ¶ 22.

---

[1] In a later conversation, one of the plaintiff's attorneys involved in this matter, Mr. David Lujan, graciously offered to fund Keen's $50,000 guaranty amount in the event that the Accion Hotel property is sold for the existing offer

5.    The Committee is deeply concerned and frustrated by the Debtor's delay and ultimate response. The Committee has made clear that it wishes to recover maximum value for the Accion Hotel sale and that all efforts should be made to market the property sufficiently in Asia. Notwithstanding the clarity of the Committee's position, the Debtor failed to provide frequent and detailed updates on its ongoing marketing process, the Debtor failed to act with any level of urgency to enlist the support of a brokerage firm with greater experience marketing commercial properties in Asia, and when the Committee solved the problem itself and presented a viable option to the Debtor, the Debtor failed to act quickly and ultimately refused the Committee's request without providing any reasonable explanation for doing so. The voices of Committee members were, once again, ignored.

6.    It is particularly galling to have the Committee's opinion disregarded on this issue yet again because only the interests of unsecured creditors are implicated in the sale of the Accion property. As Debtor's counsel seemed to acknowledge at the hearing on May 31, 2019, proceeds from the Accion Hotel property should be used exclusively to pay creditor claims. And it is the Committee's position that proceeds of the Accion Hotel sale should not, under any circumstances, or to any extent, be used to fund costs of administration in this case. The Archdiocese, according to its last monthly operating report, holds at least $1,506,678.73 in unrestricted cash. ECF No. 200, 3. Even if the Debtor's cash reserves were less substantial, the Committee's position would be the same. The purpose of this case, and the purpose of the sale of the Accion Hotel, is not to ensure the payment of administrative fees as they accrue. The purpose of this case, and the purpose of the sale of the Accion Hotel, is to recover as much as possible to pay the claims of unsecured creditors. In this context, the opinion of the Committee should weigh very heavily.

7.    After learning of the Debtor's refusal to retain Keen Summit, the Committee voted to retain Keen Summit itself. While it is not commonplace for a Committee to seek to retain a broker to sell estate assets, official committees have standing under the Bankruptcy Code to seek

---

amount of $5.35 million or less. Mr. Lujan's offer was conveyed to Debtor's counsel on July 2, 2019, and Debtor's counsel acknowledged that this nullified the first of its concerns regarding the retention of Keen. Kugler Decl. ¶ 24.

APPLICATION TO EMPLOY KEEN SUMMIT
CORE/3515288.0002/151631119

very broad forms of relief, 11 U.S.C. § 1103(c)(5), and it is entirely appropriate for official committees to play an active role in guiding Chapter 11 reorganizations. In fact, this is precisely what Congress intended.

8. In 1978, Congress fundamentally changed the bankruptcy system by, among other things, empowering debtors, security holders, and committees to guide corporate reorganization. *In re Drexel Burnham Lambert Group, Inc.*, 133 B.R. 13, 16 (Bankr. S.D.N.Y. 1991). "Official committees were intended to play a central role. . . ." *Id.* Bankruptcy courts were provided with substantial discretion to authorize committee professionals to take a wide array of assertive actions "based on the particular facts of each case." *Id.* In the context of applications like this one, courts consider whether a request to employ a professional is duplicative or wasteful and if the availability of another professional's work is "unambiguous and can have only one clear, undisputed interpretation." *In re Saxon Indus., Inc.*, 29 B.R. 320, 322 (Bankr. S.D.N.Y. 1983). As the terms of employment outlined below make clear, if retained, Keen's work would supplement Ms. Campos's efforts, and it would not be duplicative. More importantly, Mr. David Lujan, attorney for certain creditors, has promised to pay Keen its $50,000.00 flat fee should Keen be unable to obtain a higher and better offer for the Accion Hotel than the offer of $5.350 million currently before the Court. As a result of Mr. Lujan's offer, Keen's retention would not lead to any material additional administrative expense.

9. The Committee therefore hereby makes an application ("Application") to this Court for entry of an order, under 11 U.S.C. §§ 327, 328, and 1103, authorizing the Committee to retain and employ Keen, as a real estate agent to the Committee for purposes of selling the Accion Hotel. In support of this Application, the Committee relies on the attached Verified Statement of Harold Bordwin, Principal and Managing Director for Keen (the "Keen Verification").

10. The Court has jurisdiction to consider this Application pursuant to 28 U.S.C. §§ 157 and 1334, and Bankruptcy Rule 5005. This is a core proceeding pursuant to 28 U.S.C. § 157(b), and venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

11.     The petition commencing this case was filed on January 16, 2019. This case is now pending in this Court.

12.     On July 1, 2019, the Committee selected Keen to serve as its real estate agent to provide services to supplement the work of the Debtor's RE/MAX. Specifically, Keen will focus on marketing the Accion Hotel in markets that RE/MAX has been unable to reach, including Asia and North America. The Committee believes that Keen (i) possesses extensive knowledge and skill in the areas of commercial real property sales, sales of hospitality properties, and bankruptcy sales and auctions pursuant to Section 363, and (ii) possesses contacts with real estate investors internationally and marketing techniques for reaching real estate investors internationally, all of which skills and experiences are relevant to obtaining the highest and best offer for the Accion Hotel. Accordingly, the Committee seeks an order authorizing the employment of Keen on its behalf.

13.     By this Application and the accompanying retention agreement ("Keen Retention"), a copy of which is attached as **Exhibit B** and incorporated by reference, the Committee seeks to employ and retain Keen to provide services as a real estate agent, including advertising, listing, and showing the property to procure an offer to purchase.

14.     Pursuant to Bankruptcy Code Section 328(a), Keen has agreed to provide services to the Committee for a fixed fee of $50,000.00, in accordance with the terms of the Keen Retention. Additionally, if Keen's efforts procure the successful bidder for the Accion, Keen will receive, as additional compensation, 17.5% of the difference between the final gross sale price for the Accion and gross proceeds under the current offer for the Accion of $5.350 million, also in accordance with the terms of the Keen Retention.

15.     The Committee is familiar with the professional standing and reputation of Keen in the bankruptcy arena and recognizes that Keen has experience providing real-estate brokerage and auction services for properties similar to the Accion Hotel.

16.     Keen's professionals develop marketing plans that create market excitement and result in maximizing asset values quickly and efficiently. Keen is experienced in selling real

APPLICATION TO EMPLOY KEEN SUMMIT

property via a standard real estate brokerage process, an auction process, or a confidential merger and acquisition process. Under any scenario, Keen is focused on creating a competitive bidding process and providing its clients with an accelerated timetable for closing.

17.     Neither Keen nor any of its professionals or paraprofessionals, insofar as the Committee has been able to ascertain, represent any interest adverse to the Debtor, the Committee, the estate, or its creditors, a in the matters on which Keen is to be engaged. Keen is a "disinterested person," as the Committee understands this term to be defined, within the meaning of section 101(14), as modified by section 1103(b), of the Bankruptcy Code.

18.     To the best of the Committee's knowledge, Keen has no prior connection with the Debtor, its creditors, or any other party-in-interest, or their respective attorneys or accountants in the matters upon which it is to be engaged that would in any way disqualify it from representing the Debtor.

19.     Keen has indicated a willingness to act as a real estate agent on the Committee's behalf, in accordance with the terms of the Keen Retention and this Application.

20.     Notice of this Motion has been given to (i) the U.S. Trustee; (ii) counsel to the Debtor; and (iii) those parties requesting notice pursuant to Bankruptcy Rule 2002. The Committee submits that, in light of the nature of the relief requested, no other or further notice need be given.

21.     The Committee has not made a similar Application in this Court or in any other court to employ Keen in this Bankruptcy Case.

22.     Under sections 327 and 328 of the Bankruptcy Code, a committee may employ one or more professionals, which do not hold or represent an interest adverse to its estate and that are disinterested persons, to assist the Committee in carrying out its duties under the Bankruptcy Code. 11 U.S.C. § 327. Specifically, section 328(a) of the Bankruptcy Code provides that

> The [Committee], . . . with the court's approval, may employ or authorize the employment of a professional person under section 327 . . . of this title . . . on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis.

APPLICATION TO EMPLOY KEEN SUMMIT

11 U.S.C. § 328(a). The Committee is specifically seeking the entry of an Order approving Keen's retention pursuant to Section 328(a) on a "fixed …" basis and on a "contingent fee basis". As such, the appropriate standard for review of its final fee application shall be the standard set forth in Section 328(a) and not Section 330.

WHEREFORE, the Committee respectfully requests entry of an order in the form attached authorizing the Committee to retain Keen as real estate agent for the Committee, effective as of July 3, 2019, and granting such further relief as may be just and proper.

RESPECTFULLY SUBMITTED this 7th day of July, 2019.

STINSON, LLP

/s/ Robert T. Kugler

Robert T. Kugler

APPLICATION TO EMPLOY KEEN SUMMIT

IN THE DISTRICT COURT OF GUAM

TERRITORY OF GUAM

BANKRUPTCY DIVISION

| In re: | Chapter 11 Bankruptcy |
| | |
| ARCHBISHOP OF AGAÑA, | Case No. 19-00010 |
| | |
| a Corporation Sole, | **AFFIDAVIT OF HAROLD BORDWIN, IN SUPPORT OF APPLICATION TO EMPLOY KEEN-SUMMIT CAPITAL PARTNERS LLC AS REAL ESTATE AGENT TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS** |
| Debtor. | |

I, Harold Bordwin, declare under penalty of perjury as follows, pursuant to Rules 2014(a) and 2016(b) of the Federal Rules of Bankruptcy Procedure:

1.      I am Principal and Managing Director of Keen-Summit Capital Partners LLC ("Keen").

2.       I began my career in 1985 in Los Angeles as a litigation associate at the law firm of McKenna Conner & Cuneo (which subsequently became McKenna Long & Aldridge, which subsequently became Dentons) and then at Stroock & Stroock & Lavan. I remain a member of the California Bar Association, on inactive status. I am also a FINRA licensed investment banker with series 7, 24, 63 and 79 licenses, and a licensed real estate broker in multiple jurisdictions.

3.      I have been employed by Keen-Summit Capital Partners LLC since its formation on January 1, 2015, and by one or another of its predecessor firms since 1988, 31 years ago. Keen is the successor entity to Keen Realty Consultants Inc., a real estate workout and advisory business that was founded by my father in 1982, 37 years ago. Keen provides a range of real estate

workout and restructuring services to its clients. Most relevant to this engagement are its services related to the accelerated sales of real estate in Chapter 11 proceedings. Keen's services are property type agnostic and geographically agnostic. Current and recent clients for whom we've provided these services include:

     a. **In re Catholic Bishop of Spokane**, Bankr. E.D. WA, Case No. 04-08822; Sold Catholic Pastoral Center as well as various parcels of land totaling approx. 1,200 acres, $3,726,000;

     b. **Franciscan Medical Center**, Dayton, OH: Sold closed, 975,000± sq. ft. medical center complex on 27 acres, $3,000,000;

     c. **In re GEM Hospitality LLC, et. al**, Bankr. C.D. IL, Case No. 18-80361; Sold the Marriott Peoria Pere Marquette (286 rooms) and the Courtyard Peoria Downtown (116 rooms), $38,500,000;

     d. **In re Seaboard Realty,** Bankr. D.Del Case No. 15-12508: Sold Marriott Courtyard Downtown Stamford (115 rooms), $26,000,000;

     e. **In re Hudson Hospitality Holdings, LLC,** Bankr. D. CT. Case No. 17-20717: Sold Mystic River Inn (147 rooms), $3,550,000;

     f. **In re SDI, Inc.,** Bankr. N.D. GA Case No. 07-66794: Sold 68-room hotel, $2,400,000;

     g. **In re Southcoast Express, Inc. and Sky View Lines, LLC,** Bankr. D. MA. Case No. 05-18685: Sold Holiday Inn Express & Marina (88 rooms), $6,500,000;

     h. **In re Greek Peak Mountain Resort,** Bankr. N.D. NY Case No. 12-31471: Provided valuation and bankruptcy consulting services to Newtek Business Services (and the FDIC) in connection with the sale of Greek Peak Mountain Resort;

9

i.      **Capital Hotel Investors,** Raleigh, NC; Sold Knights Inn Hotel (f/k/a Double Tree) a 272-room vacant hotel, $4,400,000;

j.      **The Comanche Inn,** Taos, NM; On behalf of receiver, sold the 124-room Comanche Inn, $1,900,000;

k.      **Grossingers Hotel and Golf Resort,** Bankr. S.D. N.Y.; Sold 272 room hotel resort with championship golf course and convention center, $6,000,000;

l.      **In re Mariner Motel, Inc.**, Bankr. E.D. VA, Case No. 06-70369; Sold Mariner Motel (92 rooms) and conference room in Chincoteague, VA, $3,00,000;

m.      **Philadelphia Centre Hotel,** Philadelphia, PA; Sold 860 room hotel at auction, $21,000,000;

n.      **In re Paramount Hotel Corp.**, Bankr. S.D. NY, Case No. 03-30117; Sold former Best Western Hotel, $3,700,000;

o.      **Cordillera Golf Club**, Bankr. D. Colo. Case No. 12-24882-ABC: Sold club as a going concern for $14,200,000;

p.      **Briar's Creek Golf**, Bankr. D. SC Case No. 15-00712 (JEW): Sold prestigious and exclusive golf club as a going concern for $11,300,000;

q.      **In re Aziz Convenience Stores**, Bankr. S.D. TX, McAllen Div., Case No. 14-70427; Sold 28 store gas station/convenience store chain as a going concern, $41,600,000. Awarded the 2016 TMA Mid-Size Transaction of the Year Award by the TMA;

r.      **In re Nirvana,** Bankr. N.D. NY Case No. 15-60823: Sold manufacturer and bottler of spring water as a going-concern, $5,750,000;

s.      I**n re Newbury Common Associates**, Bankr. D. Del, Case No. 15-12507 (LSS): Sold 3 multifamily properties (231 units), a 115 room Marriot Courtyard hotel, and

APPLICATION TO EMPLOY KEEN SUMMIT

335,500 s.f. of office and flex space for $148,240,000. Awarded the 2017 Turnaround Atlas Award - Real Estate Restructuring of the Year from the Global M&A Network;

       t.     **Food Management Group,** Bankr. SDNY Case No. 04-22880 (ASH): Sold Dunkin Donuts franchisee (18 locations plus commissary), $18,000,000.

       u.     **J. Peterman Company** Bankr. E.D. KY Case No. 99-50142 (WSH): Sold catalog retailer, $10,000,000;

       v.     **In re Bakhtaver and Aspi Irani (d/b/a Closter Plaza Shopping Center),** Bankr. D NJ, Case No. 10-47961: Raised $52 million and structured a complex j-v with a private REIT.

     4.     I am authorized by Keen to make this affidavit in support of Keen's employment as real estate agent for the Committee in the above-captioned bankruptcy case (the "Bankruptcy Case").

     5.     I have personal knowledge of the facts stated in this affidavit. If called as a witness, I could and would testify competently to these facts, except where matters are stated on information and belief. As to those facts, I am informed and believe that they are true.

     6.     I submit this affidavit in support of the *Application to Employ Keen Capital Partners, LLC as Real Estate Agent for the Official Committee of Unsecured Creditors* (the "Application").

     7.     In the Bankruptcy Case, Keen can provide the Committee with its extensive knowledge and skill in the areas of commercial real property sales, sales of hospitality properties, bankruptcy 363-sales and auctions, and contacts with real estate investors internationally, all of which skills and experiences are relevant to obtaining the highest and best offer for the Accion Hotel.

APPLICATION TO EMPLOY KEEN SUMMIT

8.      Keen has agreed to provide services to the Committee for a fixed fee of $50,000.00, in accordance with the terms of the Keen Retention. Additionally, if the Accion Hotel sells for more than the current offer price of $5,350,000, then, in that event, Keen shall have earned as additional compensation, 17.5% of the difference between (i) the final gross sale price for the Accion Hotel, and (ii) $5.350 million, as further described in the Keen Retention.

9.      Keen understands that all of its fees and expenses are subject to Court approval pursuant to the standards set forth in Section 328(a) of the Bankruptcy Code.

10.      Keen has not received any retainer from any person, or any payment, or any promise of payment in relation to this case, during the one-year period prior to the filing of the Debtor's petition.

11.      No post-petition compensation has been paid or promised to be paid from a source other than the estate in this Bankruptcy Case. However, Mr. David Lujan, attorney for certain creditors, has promised to pay Keen its $50,000.00 flat fee should Keen be unable to obtain a higher and better offer for the Accion Hotel than the offer of $5.350 million currently before the Court. Therefore the Debtor and its estate will not be liable to Keen should Keen's effort fail to realize a higher and better offer for the estate.

12.      Keen has received a list of the Debtor's creditors and other persons identified as parties in interest in the Debtor's bankruptcy case ("Conflicts Search List"). At my direction, employees of Keen processed the Conflicts Search List through Keen's conflict-check system.

13.      I have reviewed the list of entities and compared it to the clients of Keen. Based on that review, I have concluded that Keen does not have any conflicts with any of the entities listed on the Conflicts Search List.

14. Keen is a subsidiary of Summit Capital Management LLC ("Summit"). Summit is primarily in the business of buying debt from secured creditors in arms-length transactions. This affidavit of disinterestedness is not on behalf of Summit. However, to the best of my knowledge, after due inquiry to Summit, I have been advised that Summit has no connections with Debtors or other persons or entities on the Conflicts Search List.

15. Based on the process referred to above, to the best of my knowledge, information, and belief, I am informed and believe as follows:

- Keen has not had previous contact or ties with the Debtor;
- Keen has not provided services to any creditor of the Debtor;
- Keen is not a creditor, an equity security holder, or an insider of the Debtor;
- Keen is not, nor ever was, an investment banker for any outstanding security of the Debtor;
- Keen has not, within three years before the Petition Date, been an investment banker for a security of the Debtor, or an accountant or consultant to such investment banker in connection with the offer, sale, or issuance of any security of the Debtor;
- Keen has not, within two years before the Petition Date, been a director, officer, or employee of the Debtor or of an investment banker of the Debtor;
- Keen does not have an interest materially adverse to the interest of the Debtor or of any class of creditors or equity security holders by reason of any direct or indirect relationship with, connection with, or interest in, the Debtor or any investment banker, or for any other reason; and
- Keen was not owed any sums by the Debtor for services rendered or costs advanced on behalf of the Debtor prior to the Petition Date.

16.     Consistent with Section 504 of the Bankruptcy Code, Keen will not share or agree to share compensation or reimbursement with any other person or entity.

17.     Because of the nature of Keen's business, it is possible that I have personally provided and may in the future provide consulting services to other creditors or parties in interest in the Debtor's bankruptcy case, which services are wholly unrelated to any matter involving this Bankruptcy Case. However, to the best of my knowledge, none of those prior and current engagements, including the parties listed on Exhibit A, or other dealings makes Keen an interested person under the bankruptcy laws. If Keen identifies a creditor or other party in interest of the Debtor's bankruptcy estate that I have previously, or will in the future be, providing services to in connection with this Bankruptcy Case, Keen will promptly disclose such information in writing to the Court and to the Office of the United States Trustee.

[Remainder of Page Left Intentionally Blank]

DocuSign Envelope ID: F65EA448-3894-4141-9296-F41528BD30A4

Executed in _____New York_____, county of _____New York_____.
            (state or territory)           (county or local subdivision)

Dated this _____ day of June, 2019.    7/3/2019

Harold Bordwin

APPLICATION TO EMPLOY KEEN SUMMIT

CORE/3515288.0002/153438179.1

# EXHIBIT A

APPLICATION TO EMPLOY KEEN SUMMIT

CORE/3515288.0007/153138819.2

IN THE DISTRICT COURT OF GUAM

TERRITORY OF GUAM

BANKRUPTCY DIVISION

In re:

ARCHBISHOP OF AGAÑA,

a Corporation Sole,

Debtor.

Chapter 11 Bankruptcy

Case No. 19-00010

**DECLARATION OF ROBERT T. KUGLER, IN SUPPORT OF APPLICATION TO EMPLOY KEEN SUMMIT CAPITAL PARTNERS, LLC AS REAL ESTATE AGENT TO THE DEBTOR**

I, Robert T. Kugler, provide the following declaration in support of the Application of the Official Committee of Unsecured Creditors (the "Committee") to Employ Keen Summit Capital Partners, LLC ("Keen Summit") as real estate agent to the Debtor:

1.      I am a partner at the law firm Stinson LLP and one of the attorneys representing the Committee in this Chapter 11 case and the facts contained in this Declaration are true and accurate to the best of my knowledge, memory, and belief.

2.      In connection with the hearing held in this matter on May 31, 2019, the Archdiocese agreed to cooperate with the Committee to undertake renewed efforts to market the Accion Hotel property throughout Asia and, to that end, the parties agreed to extend the timeline for marketing the Accion Hotel through August 9, 2019. The Court granted the parties' joint request to do so.

3.      Unfortunately events since the May 31 hearing have not unfolded as the Committee hoped and expected they would. The following points are a non-comprehensive summary of relevant events that occurred after the May 31 hearing.

4. **Monday and Tuesday, June 3-4, 2019**.

a. In the two business days following the May 31 hearing, Committee professionals made contact with seven separate entities, each of which has substantial experience in selling real property development projects to investors in Asia.

b. In addition, the Committee marshaled connections to contact multiple investment entities and individuals with well-established connections to Asia, as well as executives within large corporations located in Asia, to encourage interest in the Accion property and to provide related information. Although Committee professionals had follow-up conversations with many of the foregoing contacts, for the sake of efficiency, only counsel's interactions relating to one firm – Keen Summit – are summarized in the paragraphs below.

c. On Tuesday, June 4, 2019, the second business day after the May 31 hearing, Committee counsel engaged in initial discussions with Keen Summit about the prospect of the estate's engaging their assistance to market the Accion Hotel property in Asia. Individuals from Keen Summit expressed interest in providing assistance, summarized their relevant experience, and committed to providing proposed terms for engagement very quickly.

d. Committee counsel sent appraisals and other property-related documents to Keen Summit for their review and consideration on the same day.

5. **Wednesday, June 5, 2019** (65 days until the August 9th hearing).

a. Committee counsel communicated with counsel for the Archdiocese regarding the Accion Hotel. Among other things, Committee counsel described its efforts to secure additional assistance in marketing the Accion property in Asia.

APPLICATION TO EMPLOY KEEN SUMMIT

b.    During the same conversation, counsel for the Debtor did not report taking any actions similar to those undertaken by Committee counsel, but Debtor's counsel did commit to providing frequent, periodic reports of new efforts undertaken by its existing real estate agent, Ms. Gina Campos.

6.    **Thursday, June 6, 2019** (64 days until the August 9th hearing). Committee counsel received a communication from Keen Summit (i) indicating that they had completed their review of property information relating to the Accion Hotel and (ii) requesting a conference call to discuss potential terms for their retention by the estate.

7.    **Friday, June 7, 2019** (63 days until the August 9th hearing).

a.    Committee counsel engaged in a live discussion with representatives of Keen Summit to provide more detail regarding the Accion Hotel property, provide information on the bankruptcy case generally, and to get a sense of Keen Summit's experience, reflections on potential marketing strategies, and potential terms for retention.

b.    Committee counsel reminded Debtor's counsel to send a report from Ms. Campos regarding her renewed marketing efforts relating to the Accion Hotel. After checking with Ms. Campos, Debtor's counsel promised to provide Ms. Campos's report by the end of the day on Monday, June 10th (Guam time).

c.    Committee counsel received proposed terms of retention from Keen Summit.

8.    **Monday, June 10, 2019** (60 days until the August 9th hearing).

a.    Committee counsel provided a report to the Committee of its efforts relating to the Accion Hotel and the Committee expressed support for the estate's retaining a second broker with greater reach into Asian markets. Members of the Committee unanimously agreed that the

APPLICATION TO EMPLOY KEEN SUMMIT

Accion Hotel property had not been sufficiently marketed in Japan, Korea, China, and elsewhere in Asia.

        b.      Debtor's counsel received a report on marketing efforts from Ms. Campos, but did not provide a copy to the Committee, as promised, on June 10th.

    9.    **Tuesday, June 11, 2019** (59 days until the August 9th hearing)**.**

        a.      Committee counsel sought more detail on the retention terms proposed by Keen Summit.

        b.      Debtor's counsel provided its report of renewed marketing efforts undertaken by Ms. Campos. The report consisted of a list of names (primarily of entities) without specific dates, notes, or other context or detail.

        c.      Committee counsel asked to receive greater detail and more context in Ms. Campos's reports. Committee counsel also requested a weekly call with Ms. Campos and to have Ms. Campos participate in the next meeting of Committee members.

        d.      Debtor's counsel agreed to have Ms. Campos talk with Committee counsel, or the Committee directly, to provide an update on her renewed marketing efforts. Weekly calls with Ms. Campos have not occurred despite Committee counsel's request.

    10.    **Wednesday, June 12, 2019** (58 days until the August 9th hearing).

        a.      Committee counsel received additional detail on potential retention terms and marketing strategies from Keen Summit during a live conference call.

        b.      Committee counsel discussed the Archdiocese's possible retention of Keen Summit with Debtor's counsel and suggested that Debtor's counsel contact Keen Summit directly. Counsel for the Archdiocese indicated that they are very familiar with Keen Summit and that they held a favorable opinion of the firm.

APPLICATION TO EMPLOY KEEN SUMMIT

c.      Debtor's counsel agreed to contact Keen Summit to discuss their possible retention by the Debtor.

d.      To the best of Committee counsel's knowledge, Debtor's counsel did not contact Keen Summit on June 12.

11.      **Thursday, June 13, 2019** (57 days until the August 9th hearing). To the best of Committee counsel's knowledge, Debtor's counsel did not contact Keen Summit on June 13.

12.      **Friday, June 14, 2019** (56 days until the August 9th hearing). Keen Summit e-mailed Debtor's counsel. Debtor's counsel agreed to talk with Keen Summit around midday on Monday, June 17, 2019.

13.      **Monday, June 17, 2019** (53 days until the August 9th hearing). Debtor's counsel and Keen Summit engaged in an introductory conversation.

14.      **Tuesday, June 18, 2019** (52 days until the August 9th hearing).

a.      Committee counsel requested an update from Debtor's counsel regarding discussions with Keen Summit.

b.      Committee counsel also reported to Debtor's counsel that Ms. Campos had not returned calls and messages for days and appeared unwilling to meet with the Committee or its counsel.

c.      Debtor's counsel delivered a second, written report regarding renewed efforts undertaken by Ms. Campos to market the Accion Hotel more thoroughly in Asia. The report again lacked context and detail sufficient to provide a meaningful update from Committee counsel's perspective.

d.      To the best of Committee counsel's knowledge, Debtor's counsel did not contact Keen Summit on June 18.

15. **Wednesday, June 19, 2019** (51 days until the August 9th hearing).

    a.    Committee counsel participated in a conference call with Debtor's counsel. Debtor's counsel indicated that they intended to discuss the retention of Keen Summit with the Archbishop. Debtor's counsel also indicated that he would set up calls for both Committee counsel and the Committee with Ms. Campos. Committee counsel expressed concern regarding the timeline for marketing the Accion Hotel property and urged Debtor's counsel to follow up with Keen Summit as soon as possible.

    b.    To the best of Committee counsel's knowledge, Debtor's counsel did not contact Keen Summit on June 19.

16. **Thursday, June 20, 2019** (50 days until the August 9th hearing). To the best of Committee counsel's knowledge, Debtor's counsel did not contact Keen Summit on June 20.

17. **Friday, June 21, 2019** (49 days until the August 9th hearing).

    a.    Ms. Campos participated in a conference call with Committee counsel and Debtor's counsel to provide more detail regarding the expansion of her marketing efforts in Asia.

    b.    To the best of Committee counsel's knowledge, Debtor's counsel did not contact Keen Summit on June 21.

18. **Monday, June 24, 2019** (46 days until the August 9th hearing).

    a.    To the best of Committee counsel's knowledge, Debtor's counsel did not contact Keen Summit on June 24.

    b.    Ms. Campos participated in a conference call with members of the Committee, Committee counsel, and Debtor's counsel to provide more detail regarding the expansion of her marketing efforts in Asia.

c.     After speaking with Ms. Campos at length, and asking a number of probing questions, Committee members unanimously agreed that a second broker, with experience selling commercial hotel properties internationally, needed to be engaged. The Committee also directed Committee counsel to demand that the Debtor retain Keen Summit.

19.     **Tuesday, June 25, 2019** (45 days until the August 9th hearing).

a.     Committee counsel contacted Debtor's counsel and, consistent with the Committee's direction, demanded that the Debtor retain Keen Summit.

b.     To the best of Committee counsel's knowledge, Debtor's counsel did not contact Keen Summit on June 25.

20.     **Wednesday, June 26, 2019** (44 days until the August 9th hearing).

a.     Committee counsel asked Debtor's counsel to participate in a call with Keen Summit to discuss Keen Summit's retention. In response, Debtor's counsel indicated that they were tracking down the Archbishop. Committee counsel reiterated, once again, that time was of the essence.

b.     To the best of Committee counsel's knowledge, Debtor's counsel did not contact Keen Summit on June 26.

21.     **Thursday, June 27, 2019** (43 days until the August 9th hearing).

a.     Committee counsel requested an update from Debtor's counsel on the retention of Keen Summit. Debtor's counsel did not provide a response.

b.     To the best of Committee counsel's knowledge, Debtor's counsel did not contact Keen Summit on June 27.

22.     **Friday, June 28, 2019** (42 days until the August 9th hearing). Debtor's counsel contacts Committee counsel and states that the Debtor will not agree to retain Keen Summit. When

Committee counsel asked for an explanation of the decision, Debtor's counsel stated, among other things, that Keen Summit would no longer have sufficient time to market the Accion Hotel property effectively in Asia and that the $50,000 guaranty required by Keen was too great an expense for the estate to bear.

23.     **Monday, July 1, 2019** (39 days until the August 9th hearing).

      a.     The Committee directed Committee counsel to file an application to employ Keen Summit directly.

      b.     Mr. David Lujan offered to fund Keen Summit's $50,000 guaranty amount in the event that the Accion Hotel property is sold for the existing offer amount of $5.35 million or less.

24.     **Tuesday, July 2, 2019** (38 days until the August 9th hearing).

      a.     Mr. Lujan's offer was conveyed to Debtor's counsel. Debtor's counsel acknowledged that Mr. Lujan's offer nullified its concerns regarding the administrative costs of retaining Keen Summit. Nevertheless, the Debtor continued to refuse to seek the retention of Keen Summit.

      b.     Ms. Campos failed to participate in a conference call scheduled with Committee counsel to provide an update regarding the Accion Hotel sale and marketing process.

I declare under penalty of perjury that the facts stated in this declaration are true and correct to the best of my information, knowledge, and belief.

Dated this 3rd day of July, 2019

Robert T. Kugler

Executed in Minnesota, county of Hennepin.

1
2
3
4
5
6
7
8
9
10
11
12 # EXHIBIT B
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

RETENTION AGREEMENT

*Between*
The Official Committee of Unsecured Creditors of the Archdiocese of Agana DIP
*and*
Keen-Summit Capital Partners LLC

July 3, 2019

In consideration of the mutual agreements herein contained and subject to the entry of the "Order" (as defined below), "Committee" (as defined below) hereby retains "Keen" (as defined below) to act as Committee's real estate advisor upon the terms and conditions set forth herein.

I.      Definitions

The following terms as used herein have the following meanings.

A.      "Bankruptcy Court" means the United States Bankruptcy Court for the District of Guam, Territory of Guam, Bankruptcy Division.

B.      "Code" means the United States Bankruptcy Code, 11 U.S.C. § 101, *et seq*.

C.      "Committee" means the Official Committee of Unsecured Creditors appointed by Order of the Bankruptcy Court in the Chapter 11 proceeding currently pending before the Bankruptcy Court of the Archdiocese of Agana DIP, Case No. 19-00010.

D.      "Debtor" means the Archdiocese of Agana DIP, Case No. 19-00010 currently pending before the Bankruptcy Court.

E.      "Effective Date" means the date of the entry of the "Order", as defined below.

F.      "Estate" means the bankruptcy estate of the Archdiocese of Agana DIP, Case No. 19-00010.

G.      "Keen" means Keen-Summit Capital Partners LLC.

H.      "Gross Proceeds" means the sum of the total consideration transferred to, or for the benefit of, the Estate and shall be inclusive of, but not limited to, cash or its equivalent, value of debt assumed or released, liabilities assumed or released, and any other consideration, paid or payable, directly or indirectly, in connection with a Transaction. The computation of Gross Proceeds as well as the computation of Keen's fee shall not be affected by the costs of advertising, the Estate's legal fees, break-up fees, Keen's expenses nor any closing costs and/or adjustments, including but not limited to adjustments and/or payments of whatever kind to lienholders, secured parties or offerors.  The computation of Gross Proceeds as well as the computation of Keen's fee shall not be affected by whether a Transaction is completed individually or as part of a package or as part of a plan of reorganization.

I.      "Order" shall mean an Order issued by the Bankruptcy Court approving this Agreement.

J.      "Property" refers to the parcel of fee-owned, real property listed on Schedule "**A**" attached hereto and incorporated by reference, which list may be supplemented without a further Order of the Bankruptcy Court.

K.    "Re/Max" means the Debtor's real estate broker, Re/Max Diamond Realty, Elizabeth Duenas, Associate Broker.

L.    "Transaction" means any transaction involving the Estate's pecuniary interests arising from or related or pertaining to Keen's services rendered under this Agreement, including, but not limited to the sale or transfer of title of to a Property.

## II.    Services

### A.    Authority

1.    Keen shall have the sole and exclusive authority to represent Committee in the negotiation of Transactions.  Keen shall represent the Estate in soliciting and closing a Transaction on a co-exclusive right to sell basis with Re/Max.

2.    In order to coordinate our efforts with respect to possible Transactions, during the term of this Agreement neither the Committee nor any representative thereof (other than Keen) will initiate discussions with a third party regarding a Transaction except through Keen.

3.    If the Debtor, Re/Max,  the Committee, and/or any of their respective management, and/or any of their respective professional advisors receives an inquiry regarding a Transaction, it will, within one business day, advise Keen by email of such inquiry in order that Keen may evaluate the inquiry and assist the Committee.

4.    Committee shall retain the complete discretion to accept or reject any proposed Transaction.

### B.    Marketing Services

Keen's services may include those generally described below, as appropriate.  Keen will:

1.    On request, review pertinent documents and will consult with the Committee and Committee's counsel, as appropriate;

2.    Coordinate with Committee the development of due diligence materials, the cost of which shall be the Estate's sole responsibility, as set forth in paragraph **IV** below;

3.    Develop, subject to Committee's review and approval, a marketing plan and implement each facet of the marketing plan, subject to funding by the Estate as set forth in paragraph **IV** below;

4.    Communicate regularly with prospects and maintain records of communications;

5.    Solicit offers for a Transaction;

6.    Assist and Committee in evaluating, structuring, negotiating and implementing the terms and conditions of a proposed Transaction;

7.    Develop and implement, subject to Committee's review and approval, an auction plan, including arranging auction logistics, assisting Committee with auction bid procedures, assisting the Committee to qualify bidders, and

running the auction at such location that may be designated by the Committee, at the sole cost and expense of the Estate;

8. Communicate regularly with the Committee and their respective professional advisors in connection with the status of its efforts; and

9. Work with Committee's attorneys responsible for the implementation of the proposed Transaction, reviewing documents, negotiating and assisting in resolving problems which may arise.

III. **Compensation**

A. <u>Engagement Fee</u>: On the Effective Date, Keen shall have earned a nonrefundable advisory and consulting fee of fifty thousand dollars ($50,000). Such fee shall be paid, in full, off the top, from the Transaction proceeds or otherwise, simultaneously with the closing or other consummation of each Transaction, but in no event later than December 1, 2019. If a Transaction closing does not occur by December 1, 2019, then such fee shall be paid in full at that time by David Lujan. The Engagement Fee shall not be subject to set off against the Transaction Fee.

B. <u>Transaction Fee.</u>

1. Committee represents that TF Investments LLC ("Existing Buyer") is a ready willing and able buyer for the Property for a price of $5,350,000 ("Contract Price"), subject only to Bankruptcy Court approval (and higher and better offers).

2. If the Estate closes a Transaction with the Existing Buyer atKeen the Contract Price, then, in that event, Keen shall have earned no compensation other than the above-referenced Engagement Fee.

3. If the Estate closes a Transaction at Gross Proceeds in excess of the Contract Price, then, in that event, Keen shall have earned seventeen and one-half percent (17.5%) of the difference between the Gross Proceeds of the Contract Price and the Gross Proceeds at the closing of the Transaction.

    4.    For the avoidance of confusion, an example of the calculation of the Transaction Fee follows:

    a)    Contract Price, $5.35 mill.

    b)    Hypothetical final sale price, $6.35 million.

    c)    Keen gets $50,000 plus 17.5% of $1 mill = $225,000[1]

C.    <u>Timing of Payment.</u> All Transaction Fees shall be paid, in full, off the top, from the Transaction proceeds or otherwise, simultaneously with the closing or other consummation of each Transaction. Committee hereby authorizes and instructs any escrow agent or counsel (without need for further authorization or permission) to pay Keen its fees earned in strict compliance with the provisions of this Agreement, time being of the essence, directly from the proceeds of the Transaction, in full, simultaneously with the closing or other consummation of the Transaction. The rights provided by this paragraph and the Order approving same shall be deemed to supplement and not supersede other rights provided to Keen.

D.    <u>Survival</u>: In the event that the Estate and any third party should enter into an agreement providing for a Transaction before the expiration of this Agreement and the closing does not occur until after said expiration, then (notwithstanding whether during the Survival term Committee engages another advisor to close a Transaction), Keen shall be entitled to a fee in accordance with the terms of this Agreement. If Committee, after the expiration of said period, arranges for a Transaction with a third party whom Keen solicited or otherwise introduced to the Property or introduced to the Committee or with whom Keen dealt in connection with the Property or Committee prior to said expiration, and the contract signing or closing takes place within twelve (12) months after said expiration, then (notwithstanding whether during the Survival term Committee engages another advisor to close a Transaction), Keen shall be entitled to a fee in accordance with the terms of this Agreement.

---

[1] Analysis:

I.    Remax will be paid 5% of the final sale price, which fee it may split with a procuring broker. 5% of $6.35 mill = $317,500.

II.    Thus, on a $6.35 mill sale, the total brokerage fees paid are $542,500 ($317,500 + $225,000), representing a blended commission rate of 8.54%.

III.    This approach:

    A.    Provides Keen with a big financial incentive to push for the highest and best price,

    B.    Protects Remax,

    C.    Protects and encourages the participation of buyer's brokers, and

    D.    On the incremental $1 million overbid, the Estate gets an additional $775,000, with $225,000 being paid as commissions (Re/Max gets 5% of $1 mill = $50,000, plus Keen gets 17.5% of $1 mill = $175,000)

IV.    **Expenses**

    A.    All reasonable out of pocket costs and expenses incurred by Keen in connection with performing the services required by this Agreement, including but not limited to travel, lodging, FedEx, postage, telephone charges, photocopying charges, and the fees and reasonable expenses of counsel, etc., shall be borne by the Estate.

    B.    With regards to the marketing of a Property, Keen shall prepare a marketing plan and budget, not to exceed $35,000 plus travel. Such marketing cap assumes the full cooperation of the Debtor and its agents and representatives in providing Keen with data responsive to Keen's request in paragraph V.D.1 below. Following Committee's approval of the budget, the Estate shall advance to Keen the budgeted amount and agrees to pay all approved, reasonable, additional costs and expenses within five (5) business days of the proper presentation of an invoice. Keen shall be under no obligation to incur marketing expenses until such time as Keen receives funds from the Estate. With respect to travel, Keen recognizes the significant costs associated therewith and will try to minimize travel to the Property. At a minimum, Keen anticipates travel to the Bankruptcy Court in connection with any auction and/or sale approval hearing. In light of the flight length, Keen shall be entitled to incur business class airfare.

    C.    Keen shall not be responsible for any out-of-pocket due diligence costs and expenses, if any, including but not limited to updating appraisals, title reports, surveys, environmental reports, property condition assessments, etc.

V.    **Estate's Responsibilities**

    A.    With respect to the Property, the entry of the Order shall impose an obligation upon Debtor to immediately inform Keen in writing, by email, as to:

        1.    any known or suspected risk of environmental hazard or contamination; and

        2.    any known, existing or pending violation(s) of federal, state or local environmental laws or regulations.

    Debtor shall have the continuing obligation to assess the accuracy of the representations contained herein and to advise Keen in writing as soon as it becomes aware of any inaccuracy, inconsistency, incompleteness or change of circumstances and to correct same.

    B.    If the Debtor and/or its agents have ordered environmental reports or studies, as soon as such become available, the Debtor shall immediately provide a true and complete copy of such reports to Keen and Keen is hereby authorized to disseminate such reports to prospects.

    C.    Physical Conditions. Committee acknowledges that Keen is not obligated to and has not made an independent investigation of the physical conditions of the Property, including, but not limited to, the condition of any improvements on the Property, or of any environmental matters with respect thereto, or of hazardous substances thereon, if any (collectively, the "Physical Conditions"). All documents and materials, investigations, reports and information with respect to the Physical Conditions shall be

prepared by or for Committee and shall be furnished to prospective purchasers on behalf of Committee, who (as between the Committee and Keen) shall be solely responsible for same.

D.  Accurate & Complete Information:

1.  Keen is hereby requesting that the Debtor provide Keen, within one business day of the entry of the Order, with true and complete copies of the following materials in the possession of it and its agents and representatives, for use by Keen in soliciting a Transaction, it being understood that Keen shall have the right to publish such materials:

    a)  Specification of what, if any, information is subject to a confidentiality agreement and, if applicable, the form of confidentiality agreement used by Re/Max before it disseminated real estate data to prospects
    b)  All professional photographs and videos of the Property
    c)  Current title report
    d)  Current phase 1 environmental report
    e)  All existing environmental reports
    f)  Copies of real estate tax bills for the Property for 2018 and YTD
    g)  Copies of all utility bills for the Property for 2018 and YTD
    h)  All real estate appraisals, business plans, feasibility studies related or pertaining to the Property
    i)  All real property surveys
    j)  All building plans
    k)  Any and all engineering reports, property condition assessment reports, geotechnical reports
    l)  Any and all zoning reports

2.  The Debtor shall make available to Keen all information reasonably requested by Keen for the purpose of enabling Keen to perform its obligations pursuant to this Agreement.  All information provided by the Debtor shall be materially accurate and complete at the time it is furnished and the Debtor shall, as soon as it becomes aware of any inaccuracy or incompleteness in information then or later provided to Keen, promptly advise Keen in writing of such inaccuracy or incompleteness and correct the same.  In performing its services hereunder, Keen shall under all circumstances be entitled to rely upon and assume, without independent verification, the accuracy and completeness of all information that has been furnished to it by, or on behalf of, the Debtor and shall have no obligation to verify the accuracy or completeness of any such information and shall not be responsible for the inaccuracy or incompleteness of any information provided to Keen.

3.  Committee covenants that when Keen presents offering materials to Committee for review and approval, Committee will promptly and diligently review same for accuracy and completeness and will advise Keen, in writing, of any corrections or modifications.   Once Keen has revised such offering

materials in a manner consistent with Committee's recommendations, Committee shall promptly review and approve, in writing, such offering materials before Keen disseminates same. Keen shall be under no obligation: (A) to disseminate offering materials that it has reason to believe are inaccurate or are materially misleading, and (B) to disseminate such offering materials until such time as Keen receives Committee's written approval of same.

E.   Within 3 business days of the Effective Date, Committee shall file an application with the Bankruptcy Court for, and will use its best efforts to obtain, an Order. With respect to the application and Order:

1.   Committee acknowledges that this Agreement in its entirety will be attached to and made a part of Committee's application to the Bankruptcy Court and will be referenced to in the Order.

2.   The application shall seek an Order authorizing the employment of Keen as of the date of this Agreement, as professional persons pursuant to Section 327 of the Code (with compensation subject to the standard of review of Section 328(a) of the Code and not any other standard, including that provided in Section 330 of the Code). The employment application and the Order shall be provided to Keen sufficiently in advance of their filing and must be acceptable to Keen in its sole discretion. In the event that the Bankruptcy Court does not enter an order acceptable to Keen, Keen shall have no further obligations under the terms of this Agreement.

3.   Committee agrees that an Order approving Keen's retention incorporates by reference this entire Agreement inclusive of the below provisions even if not specifically mentioned in the Order. Committee agrees that:

   a)   none of the fees payable to Keen hereunder shall constitute a "bonus" under applicable law;

   b)   Keen is exempt from the requirement to keep time records (unless Keen services are being billed by the hour);

   c)   Keen is exempt from the necessity of filing a fee application;

   d)   Keen's fees and expenses shall be treated as administrative expense claims in the Debtor's bankruptcy case;

   e)   Keen's fees and expenses shall be entitled to a carve-out for payment pursuant to Section 506(c) of the Bankruptcy Code;

   f)   Consistent with Section 504(a) of the Bankruptcy Code, Keen may not share or agree to share any compensation or reimbursement with another person or any compensation or reimbursement received by another person under Section 502(b)(2) or 503(b)(4) of the Bankruptcy Code;

   g)   The terms and conditions of this Agreement are "reasonable." If the Order authorizing the employment of Keen is obtained, the

Estate shall pay all fees and expenses as promptly as possible in accordance with the terms of this Agreement and the Order without the need for further application to or order of the Bankruptcy Court; and

h)  Bankruptcy Court has and shall retain core jurisdiction to hear and determine all matters arising from the implementation of this Agreement, and neither the Committee nor Keen shall be required to seek authorization from any other jurisdiction with respect to the relief granted by the Order approving this Agreement.

4.  If the Debtor obtains an order of the Bankruptcy Court authorizing financing or cash collateral use and such order requires the submission of a budget by Committee delineating its post-petition expenditures, such budget shall expressly include all amounts projected to be paid to Keen pursuant to the terms of this Agreement.  In addition, any stipulation or order for financing or cash collateral use shall include all amounts to be paid to Keen pursuant to the terms of this Agreement among any carve-out to be provided professionals in the Debtor's bankruptcy case.

5.  The terms of Section **V.F** are solely for the benefit and protection of Keen and may be waived, in whole or in part, only by Keen.

**VI.** <u>**Miscellaneous**</u>

A.  <u>Terms & Conditions</u>.  The terms and conditions set forth on Schedule **"B"** attached hereto are incorporated by reference. The provisions of this section of the Agreement shall survive the termination of this Agreement.

B.  <u>Notice</u>. Any correspondence or required notice shall be addressed as follows and shall be sent by UPS, FedEx, or similar overnight delivery service with proof of delivery, be supplemented by email, and shall be effective as of the date of actual receipt of the overnight delivery service.  Such notice shall be addressed as follows:

If to Keen, to:  Keen-Summit Capital Partners LLC
555 Madison Avenue, 5th Fl
New York, NY 10022
ATTN: Harold Bordwin
Telephone: (646) 381-9201
Email: hbordwin@Keen-Summit.com

With a copy to:  Keen-Summit Capital Partners LLC
1 Huntington Quadrangle, Suite 2C04
Melville, NY 11747
ATTN: Matt Bordwin
Telephone: (646) 381-9202
Email: mbordwin@keen-summit.com

If to Committee:    Stinson Leonard Street LLP
150 South Fifth Street, Suite 2300
Minneapolis, MN 55402
ATTN: Robert Kugler and Edwin Caldie
Telephone: 612.335.1645 and 612.335.1404
Email: robert.kugler@stinson.com and ed.caldie@stinson.com

If the foregoing correctly sets forth the agreement between the Committee and Keen, please sign and return the enclosed copy of this Agreement, whereupon it shall become our binding agreement.

**KEEN-SUMMIT CAPITAL PARTNERS LLC**

**AGREED & ACCEPTED**
This ____ day of July 2019

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

By: _____
Harold J. Bordwin, as Managing Director
Dated: _____ ___, 2019

By: _____
Name:
Title:

**AGREED & ACCEPTED AS TO PARAGRAPH III.A**
this ____ day of July 2019

**DAVID LUJAN**

By: _____
David Lujan, an individual

**SCHEDULE A**

**Property**

Approximately 72,801+ square meters (net of right-of-ways) of improved parcel of real property formerly known as the Accion Hotel Guam, and commonly referred to as 130 Chalan Seminary Road and Oceanfront, Yona, Guam, and more specifically described as Lot Numbers:

- L90-2-R1-RNEW-R3
- L90-2-R1-RNEW-3
- L90-2-R1-RNEW-1-R/W
- L90-2-R1-RNEW-2-R/W.

**SCHEDULE B**

**TERMS & CONDITIONS**

**I.** **Term of Agreement**

The term of Keen's retention shall be from the date of the entry of the Order through the confirmation of a plan of reorganization, the closing of all Transactions contemplated by this Agreement or for a period of twelve (12) months, whichever comes first, which term can be extended pursuant to the same terms and conditions and by the mutual consent of the parties without the need for further application to the Bankruptcy Court.

**II.** **Announcement**. Keen may, at its option and expense, place announcements and advertisements or otherwise publicize Keen's role on Keen's internet web site and in such newspapers and periodicals and in its marketing materials as it may choose stating that Keen has acted as advisor to the Committee with respect to the Transactions.

**III.** **Authority**. The parties hereto warrant and represent that this Agreement has been approved by all requisite corporate action and that the party executing this Agreement has full power and authority to do so.

**IV.** **Construction**

A. Headings in this Agreement are for convenience only and shall not be used to interpret or construe its provisions.

B. This Agreement shall be construed fairly as to all parties and there shall be no presumption against the party who drafted this Agreement in the interpretation of this Agreement. By executing or otherwise accepting this Agreement, Committee and Keen acknowledge and represent that they are represented by and have consulted with legal counsel with respect to the terms and conditions contained herein.

**V.** **Counterparts**. This Agreement may be executed in two or more counterparts, and by the different parties hereto in separate counterparts, each of which when executed shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement. Facsimile and electronic transmission (including the email delivery of documents in Adobe PDF format) of any signed original counterpart or retransmission of any signed facsimile transmission shall be deemed the same as the delivery of the original.

**VI.** **Dispute Resolution.**

A. <u>Choice of Law; Jury Trial</u>. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to any principles of conflict of laws. To the extent permitted by law, the parties to this Agreement waive any right to trial by jury in any action, proceeding or counterclaim (whether based upon contract, tort or otherwise) related to or arising out of the engagement of Keen pursuant to, or the performance by Keen of the services contemplated by, this Agreement.

B. <u>Attorneys' Fees</u>. If any party to this Agreement brings an action directly or indirectly based upon this Agreement or the matters contemplated hereby against any other party, the prevailing party shall be entitled to recover from the non-prevailing party, in addition to any other appropriate amounts, its reasonable costs and expenses in connection with such proceeding, including, but not limited to, reasonable attorneys' fees and arbitration and/or court costs.

    **C.**    <u>Bankruptcy Court Jurisdiction</u>.  The Bankruptcy Court has and shall retain exclusive jurisdiction to hear and determine all matters arising from the implementation or execution of this Agreement.  Any and all issues, disputes, claims or causes of action which relate or pertain to, or result or arise from, this Agreement or Keen's services hereunder, shall be settled by the Bankruptcy Court.  The Bankruptcy Court shall be limited to awarding compensatory damages and the parties hereto hereby waive their right to seek punitive, consequential, exemplary or similar types of special damages.

    **D.**    <u>Survival</u>.  The provisions of this section of the Agreement shall survive the termination of this Agreement.

**VII.**    **Electronic Communications**. The parties hereto may communicate with each other by electronic mail or otherwise transmit documents in electronic form during the course of this engagement.  The parties hereto each accept the inherent risks of these forms of communication (including the security risks of interception of or unauthorized access to such communications, the risks of corruption of such communications and the risks of viruses or other harmful devices).

**VIII.**    **Entire Agreement**.  This Agreement contains the entire agreement between the parties hereto, and no representations, inducements, promises or agreements, oral or otherwise, entered into prior to the execution of this Agreement will alter the covenants, agreements and undertakings herein set forth.  This Agreement shall not be modified in any manner, except by an instrument in writing executed by the parties.

**IX.**    **Force Majeure**.  Keen shall have no liability for delays, failure in performance, or damages due to fire, explosion, lighting, power surges or failures, strikes or labor disputes, water, acts of god, the elements, war, civil disturbances, acts of civil or military authorities, telecommunications failure, fuel or energy shortages, acts or omissions of communications carriers, or other causes beyond Keen's control whether or not similar to the foregoing.

**X.**    **Good Faith**. The parties hereto shall deal with each other fairly and in good faith so as to allow each party to perform its duties and earn the benefits of this Agreement and shall not interfere, prevent or prohibit the other, in any manner, prior to or during the term of this Agreement from carrying out its duties and obligations under the Agreement.

**XI.**    **Indemnification**.

    A.    The Estate shall defend, indemnify and hold harmless Keen and its affiliates, and its respective directors, officers, employees, agents, representatives and controlling persons (Keen and each such entity or person being an "Indemnified Party") from and against any and all losses, claims, damages, expenses and liabilities (including but not limited to counsel fees and disbursements in connection with the investigation of, preparation for, or defense of any pending or threatened claim) (collectively, "Losses"), as incurred, to which such Indemnified Party may become subject, related to or arising out of activities performed by or on behalf of an Indemnified Party pursuant to this Agreement, any transactions contemplated hereby, the Indemnified Party's role in connection therewith, the Physical Conditions of the Property or Properties, and/or the Debtor's title to the Property or Properties and/or the marketability of such title. The Estate shall have no obligation to indemnify and hold harmless an Indemnified Party for any Losses found in a final judgment by a Court of competent jurisdiction to have resulted primarily from actions taken or omitted to be taken by the Indemnified Party in bad faith or from the Indemnified Party's gross negligence or willful misconduct in performing the services described.

B.     Bankruptcy Protocol: Notwithstanding anything to the contrary:

1.     All requests of Keen for payment of indemnity pursuant to the Engagement Letter shall be made by means of an application (interim or final as the case may be) and shall be subject to review by the Court to ensure that payment of such indemnity conforms to the terms of the Engagement Letter and is reasonable based on the circumstances of the litigation or settlement in respect of which indemnity is sought, provided, however, that in no event shall Keen be indemnified in the case of its own bad-faith, self dealing, breach of fiduciary duty (if any), gross negligence or willful misconduct;

2.     In no event shall Keen be indemnified if the Estate or a representative of the estate, asserts a claim for, and a court determines by final order that such claim arose out of, Keen's own bad-faith, self-dealing, breach of fiduciary duty (if any), gross negligence or willful misconduct;

3.     In the event that Keen seeks reimbursement for attorneys' fees from the Estate pursuant to the indemnity provisions in the Engagement Letter, the invoices and supporting time records from such attorneys shall be included in Keen's own applications for approval of indemnity payments (both interim and final) and such invoices and time records shall be subject to the United States Trustee's guidelines for compensation and reimbursement of expenses and the approval of the Bankruptcy Court under the standards of Sections 330 and 331 of the Bankruptcy code without regard to whether such attorney has been retained under Section 327 of the Bankruptcy Code and without regard to whether such attorney's services satisfy Section 330(a)(3)(C) of the Bankruptcy Code.

C.     The Committee also agrees that Keen, its affiliates, and their respective directors, officers, employees, agents, representatives and controlling persons shall not be liable (whether directly or indirectly, in contract or tort or otherwise) to the Estate or its security holders or creditors, for any matter, cause or thing related to or arising out of the engagement of Keen pursuant to, or the performance by Keen of the services contemplated by, this Agreement, except to the extent that Keen is found in a final judgment by a Court of competent jurisdiction to have acted or failed to act in bad faith or with gross negligence or willful misconduct in performing the services described in this Agreement.

D.     The provisions of this Section **XI** shall be in addition to any liability that the Estate may otherwise have and shall be binding upon and inure to the benefit of any successors, assigns, heirs, and personal representatives of the Estate. These provisions shall be governed by the law of the State of New York, without regard to its conflict of law principles, and shall be operative in full force and effect regardless of any termination or expiration of this Agreement.

XII.     **No Time Records**. The services to be provided by Keen pursuant to this Agreement are transactional in nature and except with respect to hourly fees, for which Keen will maintain contemporaneous time records in half-hour increments and not on a project category basis, Keen will not be billing Committee by the hour nor keeping a record of its time spent on behalf of Committee.

XIII.     **Relationship**.

A.     Keen's role shall be as the Committee's agent and Keen hereby acknowledges its fiduciary responsibilities to Committee. Nevertheless, Committee shall remain fully responsible for all decisions and matters as to which Keen's advice is sought. Keen is assuming no management responsibilities. Committee acknowledges and agrees that its engagement of Keen hereunder

does not and is not intended to confer rights upon any person not a party hereto, including but not limited to any security holders or creditors of Committee's bankruptcy estate.

B.    Keen's duties hereunder run solely to the Committee. All advice, written or oral, provided by Keen to the Committee pursuant to this Agreement is intended solely for the use and benefit of the Committee, which agrees that such advice may not be disclosed publicly or made available to third parties without the prior written consent of Keen. Keen may condition the granting of such prior written consent upon obtaining a non-reliance letter and release from any such third parties.

C.    The provisions of this section of the Agreement shall survive the termination of this Agreement.

XIV.    **Successors and Assigns/Change of Control**. Upon the commencement of this Agreement, it shall be binding upon and shall inure to the benefit of the parties hereto, their successors and assigns. In the event the proceeding is converted from the Chapter 11 to Chapter 7, this Agreement shall remain in full force and effect. The provisions of this section of the Agreement shall survive the termination of this Agreement.